AO 106 (REV 4/10) Affidavit for Search Warrant

AUSA Emily Vermylen, (312) 469-6309

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

<u>UNDER SEAL</u>



In the Matter of the Search of:

Case No.      22 cr 531

The single-family home and attached garage located at 2410 Mark Avenue, Zion, Illinois, further described in Attachment A

FILED
10/17/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Herbert Hogberg III, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, and contraband.

The search is related to a violation of:

*Code Section*

Title 18, United States Code, Section 2113(a)

*Offense Description*

bank robbery

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

*Herbert C Hogberg III*

*Applicant's Signature*

HERBERT HOGBERG III, Special Agent
Federal Bureau of Investigation
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: October 17, 2022

*Judge's signature*

City and State: Chicago, Illinois

JEFFREY I. CUMMINGS, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT    )
                                            )

NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, Herbert Hogberg III, being duly sworn, state as follows:

1.  I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately July 2002.

2.  As part of my duties as an FBI Special Agent, I investigate criminal violations relating to violent crimes, including, among others, kidnaping, bank robbery, and the apprehension of violent fugitives. I have participated in the execution of multiple federal search warrants.

3.  This affidavit is made in support of an application for a warrant to search the single-family home and attached garage located at 2410 Mark Avenue, Zion, Illinois, described further in Attachment A (the "**Subject Premises**"), for evidence, instrumentalities, and contraband described further in Attachment B, concerning bank robbery offenses, in violation of Title 18, United States Code, Section 2113(a) (the "**Subject Offense**").

4.  This affidavit is based on my personal knowledge and observations, information provided to me by other law enforcement agents who have knowledge of the events and circumstances described herein, law enforcement records, interviews of witnesses, my review of surveillance video, my training and experience, and the training and experience of other law enforcement agents.

5.      Because this affidavit is being submitted for the limited purpose of securing a search warrant for the **Subject Premises**, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, instrumentalities, and contraband of the **Subject Offense** are located at the **Subject Premises**.

## I.      FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

6.      In summary, and as set forth in more detail below, there is probable cause to believe that HARIS MATCHALOVAS committed 7 bank robberies in the Chicago, Waukegan, Evanston, and Skokie, Illinois, areas, beginning in approximately November 2021, and that evidence, instrumentalities, and contraband from those bank robberies will be found at the **Subject Premises**. Specifically:

a.      On or about November 24, 2021, MATCHALOVAS stole approximately $4,118 from a BMO Harris Bank in Waukegan, Illinois;

b.      On or about February 18, 2022, MATCHALOVAS stole approximately $13,525 from a Parkway Bank in Chicago, Illinois;

c.      On or about March 3, 2022, MATCHALOVAS stole approximately $7,973 from a Huntington Bank in Skokie, Illinois;

d.      On or about April 22, 2022, MATCHALOVAS stole approximately $1,843 from a Fifth Third Bank in Chicago, Illinois;

2

e.     On or about May 10, 2022, MATCHALOVAS stole approximately $5,866 from a Huntington Bank in Chicago, Illinois;

f.     On or about June 11, 2022, MATCHALOVAS stole approximately $2,166 from a Huntington Bank in Chicago, Illinois; and

g.     On or about August 3, 2022, MATCHALOVAS stole approximately $318 from a Huntington Bank in Evanston, Illinois.

7.     As set forth more fully below, these bank robberies generally followed the same pattern. An individual, subsequently identified by law enforcement as MATCHALOVAS, would enter the bank wearing a surgical or cloth face mask and carrying a backpack. In each of the 7 bank robberies, MATCHALOVAS wore distinctive grey gloves with dark, latex-coated palms and white writing on the back of the palms. MATCHALOVAS would approach the teller counter or podium and demand that the tellers at the counter give him the money in their teller drawers. In five of the seven robberies, MATCHALOVAS displayed a kitchen or chef's knife.

8.     In six of the bank robberies, law enforcement identified the getaway car as either a silver Oldsmobile Aurora, a black Cadillac SRX or a red Cadillac SRX. There are three cars registered to the **Subject Premises**: a silver Oldsmobile Aurora registered to MATCHALOVAS' father, a black Cadillac SRX registered to MATCHALOVAS' father and mother, and a red Cadillac SRX registered to MATCHALOVAS' mother. On December 2, 2021, law enforcement stopped MATCHALOVAS while he was driving a silver Oldsmobile Aurora, and on September

3

9, 2022, law enforcement stopped MATCHALOVAS while he was driving a red Cadillac SRX.

9.      Furthermore, when MATCHALOVAS was stopped by law enforcement on December 2, 2021, he provided telephone number (224) 302-8785 (the "Matchalovas Phone") as his telephone number. Historical cell site data for the Matchalovas Phone reflects that it used a cell site tower within a mile of the site of each of the 7 bank robberies, within 10 minutes of each of the 7 bank robberies. Accordingly, there is probable cause to believe that evidence relating to the **Subject Offense** is stored on the Matchalovas Phone.

10.      Furthermore, during the August 3, 2022 bank robbery, MATCHALOVAS wore a distinctive grey t-shirt with the word "Champion" written all over it; MATCHALOVAS appears wearing the same t-shirt in his Illinois driver's license photo. MATCHALOVAS's ex-fiancé, Individual C, identified MATCHALOVAS as the bank robber based on stills of the video surveillance of the June 11, 2021 bank robbery, and identified multiple items of clothing worn by MATCHALOVAS during the course of the various bank robberies. Finally, approximately forty minutes after the bank robbery on August 3, 2022, MATCHALOVAS robbed a Costco in Mettawa, Illinois, driving a red Cadillac SRX – the same make and model car that he used as a getaway car in the bank robbery – and wearing similar clothes; and surveillance video of the Costco robbery captured MATCHALOVAS' distinctive tattoo on his right forearm. Six days later, on August 9,

4

2022, MATCHALOVAS committed two additional retail thefts using a red Cadillac SRX.

11.     Based on law enforcement surveillance of the **Subject Premises** conducted on October 14, 2022, MATCHALOVAS resides at the **Subject Premises**. In addition, according to Individual C, MATCHALOVAS resides at the **Subject Premises** with his parents, Individuals A and B, and his 18-year-old son, Individual D. There is probable cause to believe that the clothing and accessories worn by MATCHALOVAS, and the backpacks and knives used by him, during the commission of each of the 7 bank robberies, are stored within the **Subject Premises**.

**A.     November 24, 2021, Robbery of BMO Harris Bank, 3113 North Lewis Avenue, Waukegan, Illinois**

12.     According to bank surveillance video, on November 24, 2021, at approximately 3:17 p.m., a white male individual, later identified as MATCHALOVAS[1], entered the BMO Harris Bank located at 3113 North Lewis Avenue in Waukegan, Illinois (the "Waukegan BMO Harris"). Based on my review of

---

[1] As described further below, law enforcement identified this individual as MATCHALOVAS based on the following: (1) the robbery was committed in a manner consistent with the other bank robberies in that MATCHALOVAS carried a backpack; wore distinctive gloves with latex-coated palms; and displayed a knife; (2) the robber used a silver Oldsmobile Aurora as a getaway car, consistent with the car registered to MATCHALOVAS' father and with the car that MATCHALOVAS was driving when he was stopped by law enforcement on December 2, 2021; (3) Individual C identified shoes worn by the bank robber as shoes owned by MATCHALOVAS; and (4) cell site data from the Matchalovas Phone places MATCHALOVAS within a mile of the Waukegan BMO Harris approximately six minutes before the bank robbery occurred.

the bank surveillance video, the individual was wearing a black "puffy" jacket; a hood pulled tightly over his face; grey gloves with dark, latex-coated palms and white writing on the back of the palms; gray sweatpants with a Nike logo on the left thigh; black, Adidas-brand shoes with white soles; and a blue surgical mask. The individual was carrying a black, Adidas-brand backpack with a white Adidas logo and a grey interior.

13.    According to the bank teller who interacted with the individual ("Victim Teller 1"), the individual was a white male with blue eyes, aged 35 to 40 years old, and approximately 5 feet 6 inches tall.

14.    Based upon her review of stills from bank surveillance video, MATCHALOVAS's ex-fiancé, Individual C, identified the individual's black, Adidas-brand shoes with white soles as matching the appearance of a pair of shoes belonging to MATCHALOVAS.

15.    According to Victim Teller 1, after Victim Teller 1 greeted the bank robber, the robber tossed his black backpack over the teller line to Victim Teller 1 and leaned away from Victim Teller 1 so that his face was obstructed. The bank robber demanded, "give me what you have in the drawer." According to Victim Teller 1, she was "scared" and "froze;" she also "stated to shake." The bank robber then pulled a knife out of his sleeve and stated, "hurry up so no one gets hurt." The knife was a chef's knife with a black handle that was approximately eight inches long.

6

16.     According to Victim Teller 1, Victim Teller 1 took the money out of his/her drawer, including mutilated money and ten $50 bait bills. The bank robber put the money in his black backpack. The bank robber then "got on his tippy toes" and stated, "what about the second drawer?" Victim Teller 1 told the bank robber that another teller would be required to open the other drawer. The bank robber rolled his eyes and took the backpack with the stolen money and left the bank at approximately 3:20 p.m.





17.     According to an audit conducted by BMO Harris Bank, the bank suffered a loss of $4,118.00 due to the robbery.

18.     According to the Federal Deposit Insurance Corporation (the "FDIC") website, the bank was FDIC insured at the time of the theft.

19.     The Red and Black Flash Cab company is located at 1817 Yorkhouse Road in Waukegan, Illinois, approximately 0.07 miles north of the Waukegan BMO Harris, and shares a parking lot with 3129 North Lewis Avenue. As captured on surveillance video from the property of 3129 North Lewis Avenue, on November 24, 2021, at approximately 2:40 p.m., 37 minutes before the Waukegan BMO Harris

8

robbery, a silver, 4 -door sedan, with a missing license plate and sunroof and dark tinted windows parked near the rear of 1817 Yorkhouse Road[2].



20.     Based on law enforcement's review of the surveillance video and their training and experience, law enforcement identified the silver 4-door sedan as a 4-door Oldsmobile Aurora sedan, from model years 2001, 2002, or 2003.

21.     At approximately 2:41 p.m., 36 minutes before the robbery of the Waukegan BMO Harris, a man wearing a black coat and carrying a black backpack, consistent with the clothing worn and backpack used by MATCHALOVAS during the robbery of the Waukegan BMO Harris, walked westbound through the parking lot of Red and Black Flash Cab and 3129 North Lewis Avenue.

---

[2] The surveillance camera did not capture the silver sedan parking because the camera was motion-activated and the silver sedan parked outside the range of the motion sensor.



22.     At approximately 3:21 p.m., approximately one minute after the bank robbery, surveillance footage captured the silver Oldsmobile Aurora leaving the parking lot and driving eastbound on Yorkhouse Road [3].

---

[3] The surveillance camera did not capture MATCHALOVAS entering or exiting the vehicle because MATCHALOVAS was outside the range of the camera. Surveillance did capture MATCHALOVAS walking with the silver vehicle in the background.

10



23.     According to a law enforcement database, a silver, four-door, 2001 model Oldsmobile Aurora, bearing Illinois Registration CJ82727 and VIN 1G3GR64H114127051, is registered to Individual A, at 2410 Mark Avenue, in Zion Illinois (the "Zion Residence").

24.     According to Individual C, Individual A is MATCHALOVAS' father and MATCHALOVAS lives at the Zion Residence with his parents.

25.     According to a search of the Accurint database for HARIS MATCHALOVAS, MATCHALOVAS is associated with the Zion Residence.

26.     Based upon her review of stills from surveillance video, Individual C identified the silver Oldsmobile Aurora as belonging to MATCHALOVAS. According to Individual C, MATCHALOVAS was driving the silver Oldsmobile Aurora when Individual C first met MATCHALOVAS in approximately February 2022, until approximately April 2022, when MATCHALOVAS gave the silver Oldsmobile Aurora to his son, Individual D. According to Individual C, in approximately May 2022, Individual D was involved in an accident in the silver Oldsmobile Aurora which

11

damaged the vehicle. The silver Oldsmobile Aurora is now sitting under a car cover in the driveway of the Zion Residence.

27.     During September 7, 2022 and October 14, 2022 surveillance of the Zion Residence by law enforcement, a gray or silver Oldsmobile Aurora sedan, partially covered by a tarp, was observed in the driveway of the Zion Residence.



28.     Based on my comparison of the surveillance of the Zion Residence and video surveillance from the Waukegan BMO Harris robbery, the Oldsmobile Aurora sedan driven by MATCHALOVAS in the Waukegan BMO Harris robbery appears similar to the Oldsmobile Aurora sedan in the driveway of the Zion Residence. Specifically, the wheel rims of the two vehicles are similar and the front end of the two vehicles are similar in design.

29.     According to cell site data for the Matchalovas Phone obtained from AT&T pursuant to search warrant[4], at 3:14 p.m. on November 24, 2021, approximately six minutes before the bank robbery, the Matchalovas Phone utilized a cell tower located approximately 3600 feet directly west of the Waukegan BMO

---

[4] On October 5, 2022, Magistrate Judge Heather K. McShain found probable cause to obtain historical cell site data for the Matchalovas Phone, in relation to each of the 7 bank robberies.

Harris. The map below indicates the relative positions of the cell tower and the Waukegan BMO Harris (the red dot represents the cell tower):



30.    According to cell site data for the Matchalovas Phone, at 3:06 p.m., 3:07 p.m., and 3:12 p.m. (14 minutes, 13 minutes, and 8 minutes before the bank robbery, respectively), the Matchalovas Phone transferred data to a cell tower located approximately 3000 feet northwest of the Waukegan BMO Harris. The map below indicates the relative positions of the cell tower and the Waukegan BMO Harris (the red dot represents the cell tower):



**B.    December 2, 2021, Waukegan Police Department Traffic Stop of MATCHALOVAS in Silver Oldsmobile Aurora**

31.    On December 2, 2021, at approximately 7:51 p.m., Waukegan Police Department conducted a traffic stop of a silver Oldsmobile Aurora with expired license plates in the area of Franklin Street and North Avenue in Waukegan, Illinois.

13

The silver Oldsmobile Aurora matched the description of the getaway car used in the November 24, 2021 BMO Harris bank robbery. The driver of the silver Oldsmobile Aurora, HARIS MATCHALOVAS, was identified by a comparison to the Illinois driver's license that he provided to law enforcement.

32. MATCHALOVAS provided the Matchalovas Phone number to law enforcement as his telephone number.[5]



---

[5] According to a search of the Accurint database for HARIS MATCHALOVAS, MATCHALOVAS has been associated with the Matchalovas Phone since October 2020. According to records provided by AT&T, the subscriber of the Matchalovas Phone is listed as Individual A, MATCHALOVAS's father. Individual A's billing address is listed as the Zion Residence where MATCHALOVAS resides. On August 26, 2022, MATCHALOVAS contacted the Police Department in Zion, Illinois from the Matchalovas Phone.

## C.   February 18, 2022, Robbery of Parkway Bank, 39 North Morgan Street, Chicago, Illinois

33.   According to bank surveillance video, on February 18, 2022, at approximately 4:18 p.m., a white male individual later identified as MATCHALOVAS[6], entered a Parkway Bank located at 39 North Morgan Street in Chicago, Illinois (the "Morgan Street Parkway Bank"), and approached the counter. Based on my review of the bank surveillance video, the individual was wearing a black "puffy" jacket with a hood over his head; a black sweatshirt; a black knit hat; grey gloves with dark, latex-coated palms and white writing on the back of the palms; dark blue sweatpants; black shoes; and a light blue surgical mask. The individual was carrying a black, Reebok-brand backpack.

---

[6] As described further below, law enforcement identified this individual as MATCHALOVAS based on the following: (1) the robbery was committed in a manner consistent with the other bank robberies in that MATCHALOVAS carried a backpack; wore distinctive gloves with latex-coated palms; and displayed a knife; (2) the robber used a silver Oldsmobile Aurora as a getaway car, consistent with the car registered to MATCHALOVAS' father and with the car that MATCHALOVAS was driving when he was stopped by law enforcement on December 2, 2021; and (3) cell site data from the Matchalovas Phone places MATCHALOVAS within a mile of the Morgan Street Parkway Bank at approximately the same time as the bank robbery occurred.





34.     According to a bank teller ("Victim Teller 2"), he/she observed the bank robber walk to the north door of the bank on Washington Street. Victim Teller 2

16

directed the bank robber to enter the bank at the northwest door on the corner of Morgan Street, where he entered the vestibule. Another teller ("Victim Teller 3") directed the bank robber to remove his hood prior to being buzzed into the second entry door by Victim Teller 2. The bank robber did not remove his hood. Victim Teller 3 directed Victim Teller 2 to buzz in the bank robber.

35.     According to Victim Teller 3, the bank robber then approached the teller counter and asked Victim Teller 3, "how much to open an account?" Victim Teller 3 responded, "one hundred dollars." The bank robber opened the backpack he was carrying and demanded to Victim Teller 3, "put all your money in here!" Victim Teller 3 began to move towards his/her teller drawer to obtain the money.

36.     According to Victim Teller 2, the bank robber then approached Victim Teller 2's station and demanded, "put all your money in here before I jump over!" Victim Teller 2 observed the bank robber display a large kitchen knife to Victim Teller 2. Victim Teller 2 handed the bank robber $50 bait bills and approximately $7,000 from his/her teller drawer. Victim Teller 3 put money from her teller drawer into the bank robber's backpack. The bank robber walked out of the north side door and headed east from the bank.

37.     According to Victim Teller 2, the bank robber was male; white; with a thin build; approximately 5 feet 6 inches to 5 feet 7 inches tall; wearing a black hooded jacket and a blue surgical mask.

38. According to Victim Teller 3, the bank robber was male; white; with a thin build; approximately 150 to 160 pounds; approximately 5 feet 8 inches to 6 feet tall; wearing a black hooded jacket, a blue surgical mask, black winter gloves, and carrying a black backpack.

39. According to an audit conducted by Parkway Bank, the bank suffered a loss of approximately $13,525.00 due to the robbery.

40. According to the FDIC website, the bank was FDIC insured at the time of the theft.

41. According to bank surveillance video, on February 18, 2022, at 4:10 p.m., approximately 8 minutes before the robbery of the Morgan Street Parkway Bank, MATCHALOVAS parked a silver four-door sedan at approximately 951 West Washington Boulevard and walked westbound on Washington Boulevard toward the bank. At approximately 4:19 p.m., 1 minute after the bank robbery, MATCHALOVAS returned to the vehicle and drove eastbound on Washington Boulevard.

42. According to my review of surveillance video from Chicago Transit Authority Bus #1675 and my training and experience, a silver, four-door Oldsmobile Aurora with tinted windows and no license plate was parked at approximately 951 West Washington Boulevard facing eastbound during the bank robbery.



43. Based on her review of stills from surveillance video, Individual C recognized the Oldsmobile Aurora as belonging to MATCHALOVAS.

44. Based upon my review of the bank surveillance video, the Oldsmobile Aurora driven by MATCHALOVAS in the February 18, 2022 Parkway Bank robbery appears similar to the Oldsmobile Aurora sedan in the driveway of the Zion Residence. Specifically, the wheel rims of the two vehicles are similar and the front end of the two vehicles are similar in design.

45. According to cell site data for the Matchalovas Phone, at 4:10 p.m. on February 18, 2022, approximately eight minutes before the bank robbery, the Matchalovas Phone transferred data to a cell tower located approximately 700 feet northeast of the Morgan Street Parkway Bank. The map below indicates the relative positions of the cell tower and the Morgan Street Parkway Bank (the red dot represents the cell tower):

19



46.    According to cell site data for the Matchalovas Phone, at 4:18 p.m., at approximately the same time as the bank robbery, there was a data transfer[7] from the Matchalovas Phone to a cell tower located approximately 3200 feet northwest of the Morgan Street Parkway Bank. The map below indicates the relative positions of the cell tower and the Morgan Street Parkway Bank (the red dot represents the cell tower):

---

[7] Data transfers may be initiated without input from the user of a cellular telephone.



47.     According to cell site data for the Matchalovas Phone, at 4:21 p.m., approximately three minutes after the bank robbery, the Matchalovas Phone transferred data to a cell tower located approximately 2600 feet southeast of the Morgan Street Parkway Bank. The map below indicates the relative positions of the cell tower and the Morgan Street Parkway Bank (the red dot represents the cell tower):



**D.      March 3, 2022, Robbery of Huntington Bank, 9449 Skokie Boulevard, Skokie, Illinois**

48.     According to bank surveillance video, on March 3, 2022, at approximately 5:50 p.m., a white male individual, later identified as

21

MATCHALOVAS[8], approached the teller podium of a Huntington Bank located within a Jewel supermarket at 9449 Skokie Boulevard in Skokie, Illinois (the "Skokie Huntington Bank"). Based on my review of the bank surveillance video, the individual was wearing a dark blue sweatshirt; grey gloves with dark, latex-coated palms and white writing on the back of the palms; dark blue sweatpants; gray shoes; and a light blue surgical mask. The individual was carrying a black backpack.



<hr>

[8] As described further below, law enforcement identified this individual as MATCHALOVAS based on the following: (1) the robbery was committed in a manner consistent with the other bank robberies in that MATCHALOVAS carried a backpack; wore distinctive gloves with latex-coated palms; and displayed a knife; (2) the robber used a silver Oldsmobile Aurora as a getaway car, consistent with the car registered to MATCHALOVAS' father and with the car that MATCHALOVAS was driving when he was stopped by law enforcement on December 2, 2021; and (3) cell site data from the Matchalovas Phone places MATCHALOVAS within a mile of the Skokie Huntington Bank approximately seven minutes before the bank robbery occurred.

49.     According to the teller at the podium when the bank robber approached ("Victim Teller 4"), Victim Teller 4 was starting to close his/her teller drawer and had money in his/her hand. The bank robber approached the teller podium and stated, "hello, ladies, I would like to make a withdrawal." The bank robber moved close to Victim Teller 4 and was making Victim Teller 4 uncomfortable due to his proximity. The bank robber then demanded, "give me your money." Victim Teller 4 realized the bank was being robbed and became fearful for his/her safety and the safety of those around him/her.

50.     According to Victim Teller 4, the bank robber pulled back the left inside sleeve of his sweatshirt to reveal the sharp end of a knife in his sleeve. Victim Teller 4 put approximately $1500 into a backpack held by the bank robber.

51.     According to another bank teller ("Victim Teller 5"), the bank robber then turned to Victim Teller 5 and demanded, "all that money from the drawer, put that in here," as he indicated the backpack. Victim Teller 5 put money he/she was already holding in his/her hand in the backpack. The bank robber then ordered, "from the other drawer too," so Victim Teller 5 opened his/her top drawer and removed the money, estimated at $2600, and put it in the backpack. The bank robber repeatedly stated, "hurry up," and "hurry the fuck up," in order to rush Victim Teller 5.

52.     According to another bank teller ("Victim Teller 6"), the bank robber then turned to Victim Teller 6, who opened his/her drawer, removed a stack of $5 bills

estimated at a total of $245, and put the money in the open backpack. The bank robber closed the backpack and exited the doors located on the west side of the Jewel.

53.     According to an audit by Huntington Bank, the bank suffered a $7,973.00 loss as a result of the robbery.

54.     According to the FDIC website, the bank was FDIC insured at the time of the theft.

55.     According to video surveillance, at approximately 5:30 p.m., 20 minutes before the bank robbery, a silver, 4-door sedan with tinted windows, a sunroof, and no front or rear license plates drove from the west side of Jewel to the east side before going off camera for approximately 3 minutes. Based on my review of the surveillance video and my training and experience, I identified the silver 4-door sedan as a 4-door Oldsmobile Aurora sedan, from model years 2001, 2002, or 2003. Approximately 1 minute later, the Oldsmobile Aurora drove from the east side of Jewel to the west side of Jewel before going off camera. Approximately 2 minutes later, a man wearing a dark sweatshirt and carrying a black backpack, consistent with the clothing worn and backpack used by MATCHALOVAS during the robbery of the Skokie Huntington Bank, entered the Jewel via the doors located on the west side of the Jewel, near the location where the Oldsmobile Aurora went outside the range of the security camera.



56.    Based on her review of stills from surveillance video, Individual C recognized the Oldsmobile Aurora as belonging to MATCHALOVAS.

57.    Based upon my review of the surveillance video and my training and experience, the Oldsmobile Aurora driven by MATCHALOVAS in the March 3, 2022 Skokie Huntington bank robbery appears similar to the Oldsmobile Aurora sedan in the driveway of the Zion Residence. Specifically, the wheel rims of the two vehicles are similar and the front end of the two vehicles are similar in design.

58.    According to cell site data for the Matchalovas Phone, at 5:43 p.m. on March 3, 2022, approximately seven minutes before the bank robbery, the Matchalovas Phone utilized a cell tower located approximately 3300 feet southwest of the Skokie Huntington Bank. The map below indicates the relative positions of the cell tower and the Skokie Huntington Bank (the red dot represents the cell tower):

25



**E.     April 22, 2022, Robbery of Fifth Third Bank, 837 West North Avenue, Chicago, Illinois**

59.     According to bank surveillance video, on April 22, 2022, at approximately 5:40 p.m., a white male individual, later identified as MATCHALOVAS[9], approached the teller counter of a Fifth Third bank located at 837 West North Avenue in Chicago, Illinois (the "North Avenue Fifth Third Bank"). Based on my review of the bank surveillance video, the individual was wearing a black and grey jacket with red trim; a dark blue, hooded sweatshirt; grey gloves with dark,

---

[9] As described further below, law enforcement identified this individual as MATCHALOVAS based on the following: (1) the robbery was committed in a manner consistent with the other bank robberies in that MATCHALOVAS carried a backpack; wore distinctive gloves with latex-coated palms; and displayed a knife; (2) Individual C identified a baseball hat worn by the bank robber as matching a baseball hat owned by MATCHALOVAS; and (3) cell site data from the Matchalovas Phone places MATCHALOVAS within a mile of the North Avenue Fifth Third Bank approximately two minutes after the bank robbery occurred.

latex-coated palms and white writing on the back of the palms; grey sweatpants; grey shoes; a black baseball hat with a "Bulls" logo on the front; and a white cloth face mask. The individual was carrying a black backpack with white lettering on a strap.

60.     Based upon her review of stills from bank surveillance video, Individual C identified the "Bulls" black baseball hat as matching the appearance of a baseball hat belonging to MATCHALOVAS.

61.     According to the teller at the counter ("Victim Teller 7"), Victim Teller 7 greeted the bank robber, but he said nothing in response and appeared to look around the bank. Victim Teller 7 sent an email to another teller ("Victim Teller 8"), stating that Victim Teller 7 "had a bad feeling" about the bank robber and asking Victim Teller 8 to come to the teller line. Victim Teller 7 also sent a similar email to another teller ("Victim Teller 9"), asking Victim Teller 9 to come to the teller line.

62.     According to Victim Teller 7, the bank robber approached the teller counter and opened the black backpack that he was carrying. The bank robber stated that this was "a fucking robbery" and to "put all the money in here," and then handed his black backpack to a teller behind the counter. The bank robber displayed a long kitchen knife with a black handle and asked multiple times, "do you want me to stab everyone here?" The bank robber again demanded that the tellers "give me all your fucking money."

63.     According to Victim Teller 8, Victim Teller 8 and Victim Teller 9 placed cash from their teller drawers inside the bank robber's black backpack. The bank

robber then reached over the teller counter, grabbed the backpack, and exited the bank, with the knife in one hand and the backpack in the other. Victim Teller 8 activated the alarm and locked the front doors, while Victim Teller 7 called 911.







64.     According to an audit conducted by Fifth Third Bank, the bank suffered

a loss of $1,843.00 as a result of the robbery.

65.     According to the FDIC website, the bank was FDIC insured at the time

of the theft.

66.     According to cell site data for the Matchalovas Phone, at 5:42 p.m. on

April 22, 2022, approximately two minutes after the bank robbery, the Matchalovas

Phone transferred data to two different cell towers: one tower located approximately

700 feet northeast of the North Avenue Fifth Third Bank, and another cell tower located approximately 1200 feet south of the North Avenue Fifth Third Bank. The maps below indicate the relative positions of the cell towers and the North Avenue Fifth Third Bank (the red dot represents the cell tower):





F.    **May 10, 2022, Robbery of Huntington Bank, 4042 West Foster Avenue, Chicago, Illinois**

67.    According to surveillance video, on May 10, 2022, at approximately 5:31 p.m., a black Cadillac drove into the parking lot of a Jewel supermarket located at 4042 West Foster Avenue in Chicago, Illinois (the "Foster Avenue Jewel"). According to a Cadillac sales manager at the Patrick Cadillac dealership located in Schaumburg, Illinois, who reviewed stills from surveillance video of the black Cadillac SRX, the vehicle is a Premier edition Cadillac SRX from model years 2014, 2015, or 2016. According to the Cadillac sales manager, the vehicle's luggage rack cross bars on the roof are a non-standard option that is not frequently seen on Cadillac SRXs.



68. According to a law enforcement database, a black 2015 Cadillac SRX bearing Illinois Registration P128429 and VIN 3GYFNFE31FS518728 is registered to MATCHALOVAS' father, Individual A, and Individual B, who according to Individual C is MATCHALOVAS' mother, at the Zion Residence.

69. Based on Individual C's review of stills from the surveillance video, Individual C stated that the black Cadillac SRX matches the appearance of a black Cadillac SRX belonging to MATCHALOVAS' parents. According to Individual C, in approximately July 2022 (two months after this surveillance footage), MATCHALOVAS' parents traded in the black Cadillac SRX for a red Cadillac SRX.

70. According to surveillance video, at approximately 5:36 p.m., a white male individual, later identified as MATCHALOVAS[10], exited the Black Cadillac SRX and entered the Foster Avenue Jewel. Approximately 24 minutes later, at 6:00 p.m., the individual approached the teller counter of a Huntington Bank within the Foster Avenue Jewel (the "Foster Avenue Huntington Bank").

---

[10] As described further below, law enforcement identified this individual as MATCHALOVAS based on the following: (1) the robbery was committed in a manner consistent with the other bank robberies in that MATCHALOVAS carried a backpack; wore distinctive gloves with latex-coated palms; and made a gesture consistent with reaching for a knife; (2) the robber used a black Cadillac SRX as a getaway car, consistent with the car registered to MATCHALOVAS' parents; (3) Individual C identified sunglasses and a sweatshirt worn by the bank robber as matching the appearance of sunglasses and a sweatshirt owned by MATCHALOVAS; and (4) cell site data from the Matchalovas Phone places MATCHALOVAS within a mile of the Foster Avenue Huntington Bank approximately one minute before the bank robbery occurred.

71.     Based on my review of the bank surveillance video, the individual was wearing a gray hooded Champion-brand sweatshirt; grey gloves with dark, latex-coated palms and white writing on the back of the palms; black sweatpants with vertical white stripes along the leg; a black baseball hat with a "DC" shoe company logo on the front; black mirrored sunglasses; and a blue surgical face mask. The individual was carrying a black backpack with "Reebok" on it.







35

72.     Based on her review of stills from the bank surveillance video, Individual C identified the black sunglasses and the black Champion sweatshirt as matching the appearance of sunglasses and a sweatshirt belonging to MATCHALOVAS.[11]

73.     According to the bank teller at teller station number 1 ("Victim Teller 10"), Victim Teller 10 was at the counter on the back wall counting the money in his/her teller drawer when Victim Teller 10 turned around and noticed the bank robber approach the teller counter. The bank robber asked Victim Teller 10 for a withdrawal slip and then immediately demanded that Victim Teller 10, "give me all your money." The bank robber then placed a black backpack onto the teller counter at the window opening. Victim Teller 10 tried to place the cash that he/she was holding in his/her hand into the teller drawer. The bank robber started to reach his right hand up his left sleeve, which made Victim Teller 10 worried that he was reaching for a knife. The bank robber stated, "I'll jump over the fucking counter if you don't give me the money." Victim Teller 10 placed the money he/she had in his/her hand into the backpack.

74.     According to Victim Teller 10, the bank robber then demanded that another teller ("Victim Teller 11") place his/her money in the backpack. Victim Teller 11 told the bank robber that the bank was closed and Victim Teller 11 did not have

---

[11] Individual C did not recognize the black backpack carried by the bank robber, but stated she had seen MATCHALOVAS with three different backpacks since they met.

any money in his/her drawer. The bank robber again stated, "I'll jump over this counter, I swear to God." Victim Teller 10 told the bank robber that was all the money they had and the bank robber left the bank area through Jewel's checkout registers.

75.     According to an audit by Huntington Bank, the bank suffered a loss of $5,866.00 due to the robbery.

76.     According to the FDIC website, the bank was FDIC insured at the time of the theft.

77.     According to cell site data for the Matchalovas Phone, at 5:59 p.m. on May 10, 2022, approximately one minute before the bank robbery, the Matchalovas Phone transferred data to a cell tower located approximately 2200 feet southeast of the Foster Avenue Huntington Bank. The map below indicates the relative position of the cell tower and the Foster Avenue Huntington Bank (the red dot represents the cell tower):



**G.** **June 11, 2022, Robbery of Huntington Bank, 4335 North Sheridan Road, Chicago, Illinois**

78. According to surveillance video, on June 11, 2022, at approximately 2:21 p.m., a white male individual, later identified as MATCHALOVAS[12], entered a Jewel supermarket located at 4335 North Sheridan Road in Chicago, Illinois, and approached the teller counter of a Huntington Bank located within the Jewel (the "Sheridan Road Huntington Bank").

---

[12] As described further below, law enforcement identified this individual as MATCHALOVAS based on the following: (1) the robbery was committed in a manner consistent with the other bank robberies in that MATCHALOVAS carried a backpack and wore distinctive gloves with latex-coated palms (though the robber did not display a knife); (2) the robber used a black Cadillac SRX as a getaway car, consistent with the car registered to MATCHALOVAS' parents; (3) Individual C identified the robber as matching the appearance of MATCHALOVAS; and (4) cell site data from the Matchalovas Phone places MATCHALOVAS within a mile of the Sheridan Road Huntington Bank approximately seven minutes before the bank robbery occurred.

79.     Based on my review of the bank surveillance video, the individual was wearing a blue, hooded sweatshirt; grey gloves with dark, latex-coated palms and white writing on the back of the palms; light grey sweatpants; black shoes; a black baseball hat with a multiple "C" (Chicago Cubs) logos on the hat and bill; and a blue surgical mask. The individual was carrying a black backpack.



80.     Based on her review of stills from bank surveillance video, Individual C identified the individual as matching the appearance of MATCHALOVAS.

81.     According to a teller at the counter ("Victim Teller 12"), Victim Teller 12 was at his/her teller station when he/she noticed the bank robber walk past the teller station to another teller window. Victim Teller 12 asked the bank robber, "can I help

39

you?" The bank robber stated, "I'm looking for a little slip," which Victim Teller 12 interpreted to mean that the bank robber was looking for a deposit slip.

82.     According to Victim Teller 12, Victim Teller 12 pulled out a deposit slip and slid it under the plexiglass divider toward the bank robber. The bank robber placed his open backpack between the teller windows in the teller area and said, "empty out your drawer." Victim Teller 12 reached for the key in his/her back pocket and activated the bank's silent alarm. The bank robber stated, "hurry the fuck up bitch!"

83.     According to Victim Teller 12, Victim Teller 12 then opened her teller drawer, took all the money out of the drawer, and placed the money into the bank robber's backpack. The bank robber then ordered Victim Teller 12 to "open up the other drawers," but Victim Teller 12 responded that she did not have access to other drawers. The bank robber became increasingly aggressive and demanding. The bank robber then walked away from the teller window and toward the south exit of the Jewel.

84.     According to an audit by Huntington Bank, the bank suffered a loss of $2,166.00 due to the robbery.

85.     According to the FDIC website, the bank was FDIC insured at the time of the theft.

86.     According to video surveillance, a black Cadillac SRX arrived in the parking lot of the Sheridan Road Huntington Bank at approximately 1:48 p.m., 33

minutes before the robbery. According to a Cadillac sales manager at the Patrick Cadillac dealership located in Schaumburg, Illinois, who reviewed stills from surveillance video of the black Cadillac SRX, the vehicle is a Premier edition Cadillac SRX from model years 2014, 2015, or 2016. The vehicle's luggage rack cross bars on the roof are a non-standard option that is not frequently seen on Cadillac SRXs.

87.    According to video surveillance, a man wearing a dark sweatshirt and carrying a black backpack, consistent with the clothing worn and backpack used by MATCHALOVAS during the robbery of the Sheridan Road Huntington Bank, exited the black Cadillac SRX at approximately 1:49 p.m. and entered the Jewel. The man exited the Jewel at 2:07 p.m. and returned to the black Cadillac. The man drove in a loop through the Jewel parking lot before parking the black Cadillac near the Jewel entrance at 2:13 p.m. At 2:19 p.m., the man again entered the Jewel. At 2:21 p.m., the black Cadillac departed the parking lot westbound toward North Broadway Street.

88.    Based on Individual C's review of stills from the surveillance video, the Black Cadillac SRX matches the appearance of a black Cadillac SRX belonging to MATCHALOVAS' parents.

89.    Based on my review of surveillance video, the black Cadillac SRX driven by MATCHALOVAS on June 11, 2022 appears to be similar to the black Cadillac SRX driven by MATCHALOVAS on May 10, 2022.



90.    According to cell site data for the Matchalovas Phone, at 2:14 p.m. on June 11, 2022, approximately seven minutes before the bank robbery, the Matchalovas Phone transferred data to a cell tower located approximately 1300 feet northeast of the Sheridan Road Huntington Bank. The map below indicates the relative position of the cell tower and the Sheridan Road Huntington Bank (the red dot represents the cell tower):



### H. August 3, 2022, Robbery of Huntington Bank, 2485 West Howard Street, Evanston, Illinois

91. According to surveillance video, on August 3, 2022, at approximately 5:06 p.m., a red Cadillac SRX with no front or rear license plates and luggage cross rack arrived in the parking lot area of a Huntington Bank located at 2485 West Howard Street in Evanston, Illinois (the "Evanston Huntington Bank").

92. According to a Cadillac sales manager at the Patrick Cadillac dealership in Schaumburg, Illinois who reviewed stills from surveillance video of the red Cadillac SRX, the vehicle is a Premier edition Cadillac SRX from model years 2014, 2015, or 2016. According to the Cadillac sales manager, the vehicle's luggage rack cross bars on the roof are a non-standard option that is not frequently seen on Cadillac SRXs.



93. Based on Individual C's review of photos from the surveillance video, the red Cadillac SRX matches the appearance of a red Cadillac SRX belonging to MATCHALOVAS's parents.

43

94.    According to a law enforcement database, a red 2016 Cadillac SRX bearing Illinois Registration DM30810 and VIN 3GYFNCE30GS504075 is registered to MATCHALOVAS's mother, Individual B, at the Zion Residence.

95.    As captured on bank surveillance video, 39 minutes after arriving in the parking lot, at approximately 5:45 p.m., a white male individual, later identified as MATCHALOVAS[13], approached the teller counter of the Evanston Huntington Bank. Based on my review of the bank surveillance video, the individual was wearing a black zip-up sweatshirt with a Puma logo; a grey t-shirt under the sweatshirt with multiple "Champion" logos and the word Champion on it; grey gloves with dark, latex-coated palms and white writing on the back of the palms; blue scrubs pants; grey shoes with white accented soles; a black baseball hat with a red bill and a yellow and red logo on the front; and a blue surgical face mask. The individual was carrying a black backpack with white lettering on a strap.

---

[13] As described further below, law enforcement identified this individual as MATCHALOVAS based on the following: (1) the robbery was committed in a manner consistent with the other bank robberies in that MATCHALOVAS carried a backpack; wore distinctive gloves with latex-coated palms; and displayed a knife; (2) the robber used a red Cadillac SRX as a getaway car, consistent with the car registered to MATCHALOVAS' mother and with the car that MATCHALOVAS was driving when he was stopped by law enforcement on September 9, 2022; (3) law enforcement identified a shirt worn by the robber (better captured by Costco surveillance during a robbery that happened 40 minutes after this robbery) as matching a shirt worn by MATCHALOVAS in his driver's license photo; and (4) cell site data from the Matchalovas Phone places MATCHALOVAS within a mile of the Evanston Huntington Bank approximately five minutes before the bank robbery occurred.



96.     According to the bank teller at the counter ("Victim Teller 14"), the bank robber approached the teller counter carrying a backpack and stated that he would "like to make a withdrawal." Victim Teller 14 stated that he/she needed to see identification from the bank robber. The bank robber thrust out his backpack and stated, "shut up, put the money in the bag." Victim Teller realized a robbery was occurring and sent an instant message to the branch manager, the bank manager, the assistant manager, and another bank teller ("Victim Teller 15"), stating, "I am being robbed."

45

97.     According to Victim Teller 14, Victim Teller 15 arrived at the teller counter from a side office to intervene. Victim Teller 15 stated, "what is going on? Can I help you with something?" The bank robber responded, "since you are here you can empty your drawer too." The bank robber then stated, "What's taking so long? Hurry up," followed by, "Okay, I am coming back there. You guys are going to make me come back there." The bank robber walked around the teller counter to retrieve the money from Victim Teller 15's drawer. Victim Teller 15 noticed that the bank robber was carrying a knife. Victim Teller 15 removed the money from her teller drawer and gave the money to the bank robber, who took the money and fled east toward the east exit doors and then south through the exit doors.

98.     Victim Teller 14 described the bank robber as a male white individual, 30-35 years old, with a bigger build, blonde hair, approximately 5 feet 5 inches tall, and 200 plus pounds.

99.     Victim Teller 15 described the bank robber as a male white individual, 30-35 years old, 5 feet 5 inches to 5 feet 9 inches, and 200 plus pounds.

100.    According to an audit conducted by Huntington Bank, the bank suffered a loss of $318.00 due to the robbery.

101.    According to the FDIC website, the bank was FDIC insured at the time of the theft.

102.    According to cell site data for the Matchalovas Phone, at 5:39 p.m. on August 3, 2022, approximately five minutes before the bank robbery, the Matchalovas

Phone transferred data to a cell tower located approximately 2400 feet north of the Evanston Huntington Bank. The map below indicates the relative position of the cell tower and the Evanston Huntington Bank (the red dot represents the cell tower):



## I.    August 3, 2022, Retail Theft by MATCHALOVAS

103.    On August 3, 2022, at approximately 6:21 p.m., approximately 36 minutes after MATCHALOVAS robbed the Evanston Huntington Bank, an individual later identified as MATCHALOVAS[14] stole five cases of cognac liquor from

---

[14] As described further below, law enforcement identified this individual as MATCHALOVAS based on the following: (1) the robber used a red Cadillac SRX, consistent with the car registered to MATCHALOVAS' mother and with the car that MATCHALOVAS was driving when he was stopped by law enforcement on September 9, 2022; (2) the robber's clothes were similar to the clothes of the Evanston Huntington Bank robber; and (3) the robber had a distinctive tattoo on his right

the Costco located at 25901 North Riverwoods Road in Mettawa, Illinois (the "Mettawa Costco").

104.   The Mettawa Costco is located approximately 24 miles north of the Evanston Huntington Bank. According to Google Maps, it takes approximately 34 minutes to drive from Evanston Huntington Bank to the Mettawa Costco.

105.   According to Costco surveillance video, MATCHALOVAS arrived and left the area of the Mettawa Costco in a red Cadillac SRX with no rear license plate. Prior to entering the Costco, MATCHALOVAS stood in the parking lot near his vehicle and proceeded to put on a black hooded sweatshirt with a Puma logo. A tattoo was visible on MATCHALOVAS' right forearm, appearing to be a word starting with "CL" or "CH" written in cursive writing and stretching from approximately MATCHALOVAS' elbow to his wrist on his right forearm.

forearm matching a tattoo law enforcement observed on MATCHALOVAS when he was stopped on September 9, 2022.



106.    Based on law enforcement review of the Costco surveillance video, the clothing that the robber wore during the Mettawa Costco robbery is similar to what MATCHALOVAS wore during the Evanston Huntington Bank robbery, with the exception that he was not wearing gloves. MATCHALOVAS was wearing a black zip-up sweatshirt with a Puma logo; a grey t-shirt under the sweatshirt with multiple "Champion" logos and the word Champion on it; blue scrubs pants; grey shoes with white accented soles; a black baseball hat with a red bill and a yellow and red logo on the front; and a blue surgical face mask. Furthermore, the red Cadillac SRX that MATCHALOVAS drove in the Evanston Huntington Bank robbery appears to be similar to the red Cadillac SRX used in the Mettawa Costco robbery.

107.    According to Costco surveillance video, MATCHALOVAS entered the store at approximately 6:21 p.m. MATCHALOVAS proceeded to the liquor area of the Costco where he loaded a cart with three cases of Remy cognac and two cases of D'Usse cognac. MATCHALOVAS then walked towards the emergency exit without

49

going to a cashier. While he was walking to the emergency exit, MATCHALOVAS appeared to use his vehicle key fob to open the red Cadillac's trunk door remotely. He loaded the cognac into his red Cadillac SRX and drove away.

108. According to Costco surveillance video, the trunk of the red Cadillac contained what appeared to be an uninflated pool in purple and blue colors and a "Winnie the Pooh" design.

109. Law enforcement obtained an Illinois driver's license picture for HARIS MATCHALOVAS.[15] MATCHALOVAS' driver's license photo depicts a white male individual with dirty blonde hair and blue eyes wearing a grey t-shirt with the word "Champion" written in cursive on multiple locations on the shoulders of the shirt. MATCHALOVAS's Illinois Driver's License describes him as male, white, 5 feet 5 inches tall, 160 pounds, brown hair, blue eyes, with date of birth July 1, 1983. The grey "Champion" t-shirt depicted in MATCHALOVAS's driver's license photo appears to be the same t-shirt worn by MATCHALOVAS during the robberies of the Evanston Huntington Bank and the Mettawa Costco.

---

[15] The picture was taken in 2020.

50



**J.      August 9, 2022, Retail Thefts by MATCHALOVAS**

110.    Six days later, on August 9, 2022, an individual later identified as MATCHALOVAS[16] stole liquor from a Walmart in located at 8500 Golf Road in Niles, Illinois (the "Niles Walmart") and from a Costco located at 2900 Patriot Boulevard in Glenview, Illinois (the "Glenview Costco").

111.    According to Walmart surveillance video, on August 9, 2022, at approximately 6:07 p.m., MATCHALOVAS arrived in a red Cadillac SRX with no front or rear license plates. MATCHALOVAS then stole $366 worth of liquor from the

---

[16] As described further below, law enforcement identified this individual as MATCHALOVAS based on the following: (1) the robber used a red Cadillac SRX, consistent with the car registered to MATCHALOVAS' parents and with the car that MATCHALOVAS was driving when he was stopped by law enforcement on September 9, 2022; and (2) the robbery was committed in a manner consistent with the other retail thefts in that MATCHALOVAS stole cases of liquor.

Niles Walmart. Based on law enforcement review of the Niles Walmart surveillance video, the red Cadillac SRX driven by MATCHALOVAS appears to be similar to the red Cadillac SRX that MATCHALOVAS was driving during the Evanston Huntington Bank robbery and the Mettawa Costco robbery.

112. According to the Walmart surveillance video, MATCHALOVAS was wearing a gray Nike t-shirt; gray Nike pants; black sunglasses; and a white baseball hat with a Bears NFL emblem on the front.



113. Approximately one hour and twenty-three minutes later, MATCHALOVAS entered the Glenview Costco, which is located approximately 4 miles northeast from the Niles Walmart. After entering the Glenview Costco at approximately 7:30 p.m., MATCHALOVAS loaded a cart with approximately four cases of liquor and exited the emergency exit doors without paying for the liquor. MATCHALOVAS loaded the liquor into his car and left the area.

114.    Based on law enforcement review of the Glenview Costco surveillance video, the robber appears to be wearing the same clothes that he was wearing during the Niles Walmart theft.



115.    MATCHALOVAS arrived and left the area in a red Cadillac SRX. Based on my review of a photo, the red Cadillac SRX driven by MATCHALOVAS to the Glenview Costco robbery appears similar to the red Cadillac SRX driven by MATCHALOVAS in the prior Mettawa Costco and Niles Walmart retail thefts and the Evanston Huntington Bank robbery.



53

### K. September 9, 2022, Gurnee Police Department Traffic Stop of MATCHALOVAS in Red Cadillac SRX

116.    On September 9, 2022, at approximately 8:38 p.m., Gurnee Police Department conducted a traffic stop of a red Cadillac SRX with no front or rear license plates in the area of Illinois Route 132 and Illinois Route 41. The driver of the red Cadillac SRX, HARIS MATCHALOVAS, was identified by a comparison to the Illinois driver's license that he provided to law enforcement. According to MATCHALOVAS, he had just retrieved the red Cadillac SRX from a body shop and the shop had not replaced the license plates on the vehicle. MATCHALOVAS stated that the license plates were in the trunk of the vehicle. Law enforcement requested that MATCHALOVAS retrieve the license plates to reattach them. Law enforcement observed a screwdriver next to the license plate in the trunk with the attachment screws also nearby. Law enforcement also observed in the trunk an item with purple and blue on it, which matched the general appearance of the uninflated Winnie the Pooh kiddie inflatable pool previously observed in the Cadillac SRX. MATCHALOVAS stated that the red Cadillac he was driving belonged to his mother, Individual B, and that the vehicle was registered to the Zion Residence. Law enforcement bodyworn camera footage captured the fact that MATCHALOVAS had a distinctive tattoo on his right forearm consisting of the word "Chicago" in cursive writing.





117.    Based on my review of photos provided by the Gurnee Police Department, the red Cadillac SRX that MATCHALOVAS was driving on September 9, 2022 appears to be similar to the red Cadillac SRX that MATCHALOVAS used in the Evanston Huntington Bank robbery; the Mettawa Costco robbery; the Niles Walmart robbery; and the Glenview Costco robbery.

118.    Based on my review of the photos provided by the Gurnee Police Department, MATCHALOVAS has a tattoo on his right forearm that consists of the word "Chicago" written in cursive writing. This tattoo is similar to the tattoo captured

55

in the surveillance footage of MATCHALOVAS in the parking lot of the Mettawa Costco immediately prior to that robbery.

**L.      MATCHALOVAS Resides at the Subject Premises.**

119.    The investigation has revealed that MATCHALOVAS resides at the **Subject Premises**. On October 14, 2022, at approximately 7:00 p.m., law enforcement knocked on the door of the Zion Residence. MATCHALOVAS[17] answered the door and stated that he currently resides at the Zion Residence.

120.    An inquiry through the Illinois Department of Motor Vehicles revealed that 2410 Mark Avenue, Zion, Illinois is the current address listed on MATCHALOVAS's active Illinois driver's license, which was issued on March 21, 2022 via online renewal.

121.    According to Individual C, MATCHALOVAS resides at the **Subject Premises** with his two parents, Individuals A and B, and his 18-year-old son, Individual D. Individual C last communicated with MATCHALOVAS on or about August 4, 2022, at which time he resided at the **Subject Premises**.

122.    I know, based on my training and experience, that it is common for subjects in a criminal investigation to store personal effects, such as person clothing, within their home. I also know that people routinely re-wear clothing and accessories and store these items in their homes. As described above, MATCHALOVAS wore

---

[17] MATCHALOVAS was identified by a comparison to his Illinois driver's license photo, depicted above.

several distinctive items of clothing during the commission of each of the 7 bank robberies, including but not limited to, grey gloves with dark, latex-coated palms and white writing on the back of the palms; a black baseball hat with a "Bulls" logo on the front; a gray hooded Champion-brand sweatshirt; a black baseball hat with a "DC" shoe company logo on the front; black mirrored sunglasses; a black baseball hat with a multiple "C" (Chicago Cubs) logos on the hat and bill; a grey t-shirt under the sweatshirt with multiple "Champion" logos and the word Champion on it; a black zip-up sweatshirt with a Puma logo; and a black baseball hat with a red bill and a yellow and red logo on the front. MATCHALOVAS also used a backpack in the commission of each of the 7 robberies, and he used a kitchen or chef's knife in five of the seven bank robberies. Clothing, accessories, backpacks, and knives consistent with those worn and used by MATCHALOVAS during the 7 bank robberies constitute evidence of the commission of the **Subject Offense**, in that MATCHALOVAS can be visually identified as the individual in the photos and videos discussed above, in part through the distinct attire, accessories, and knives MATCHALOVAS wore and used that day. I submit that there is probable cause to believe that the clothing and accessories worn by MATCHALOVAS, and the backpacks and knives used by him, during the commission of each of the 7 bank robberies, are stored within the **Subject Premises**.

### M. MATCHALOVAS Is a User of the Matchalovas Phone and He Possessed the Matchalovas Phone During the Bank Robberies.

123. According to a search of the Accurint database for HARIS MATCHALOVAS, MATACHLOVAS has been associated with the Matchalovas

Phone since October 2020. Furthermore, when MATCHALOVAS was stopped by law enforcement on December 2, 2021, he provided the Matchalovas Phone as his telephone number.

124. According to records provided by AT&T, the subscriber of the Matchalovas Phone is listed as Individual A, MATCHALOVAS's father. Individual A's billing address is listed as the **Subject Premises** where MATCHALOVAS resides.

125. According to the Police Department in Zion, Illinois, on August 22, 2022, Individual C reported MATCHALOVAS missing after Individual C was unable to contact or locate MATCHALOVAS. Individual C provided the Matchalovas Phone as MATCHALOVAS's telephone number.

126. According to the Zion Police Department, on August 26, 2022, MATCHALOVAS contacted the Zion Police Department from the Matchalovas Phone to report that he was fine and was not a missing person.

127. As described above, there is evidence that MATCHALOVAS had the Matchalovas Phone in his possession during the commission of each of the 7 bank robberies. In sum, historical cell site data for the Matchalovas Phone reflects that the Matchalovas Phone used a cell site tower within a mile of the site of each of the 7 bank robberies, within 10 minutes of each of the 7 bank robberies.

128. According to records provided by AT&T, during the time period covering the commission of the 7 bank robberies, from November 24, 2021 through August 3,

2022, the Matchalovas Phone number has been associated with 4 different iPhones. Most recently, since approximately May 2022, the Matchalovas Phone number is associated with an iPhone X, bearing IMEI 3548620959326945 and IMSI 310280028152167.

129.   Based on my training and experience, I know that individuals who commit bank robberies use their cellular telephones to research the location, hours of operation, and other information regarding the banks that they seek to target. These individuals may also use their cellular telephones to document the evidence of their crimes, such as the proceeds from the robberies. That data can remain stored on a physical cellular phone even after the phone number has been transferred to a new cellular phone. I submit that there is probable cause to believe that evidence, instrumentalities, or contraband of the **Subject Offense** can be found on phones belonging to Matchalovas.

## II.   SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

130.   Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a

59

qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

131. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software

(operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

132.    In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

### III.    PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

133.    Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the **Subject Premises** described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

134.    The review of electronically stored information and electronic storage media removed from the **Subject Premises** described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.      examination of all the data contained in cellular phones belonging to MATCHALOVAS, including the Matchalovas Phone, to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.      surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d.      opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

135.    The government will return the cellular phones removed from the **Subject Premises** described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the cellular phones contain evidence, contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## IV.    BIOMETRIC ACCESS TO DEVICES

136.    This warrant permits law enforcement agents to obtain from the person of HARIS MATCHALOVAS (but not any other individuals present at the **Subject Premises** at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock cellular phones belonging to MATCHALOVAS requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Matchalovas Phone. The grounds for this request are as follows:

137.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

138.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device

by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

139.   If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

140.   If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the

64

registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

141. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

142. As discussed in this Affidavit, I have reason to believe that cellular phones belonging to MATCHALOVAS, including the Matchalovas Phone, will be found during the search. The passcode or password that would unlock the cellular phones subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the cellular phones, making the use of biometric features necessary to the execution of the search authorized by this warrant.

143. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For

example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

144. Due to the foregoing, if a cellular phone may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from HARIS MATCHALOVAS the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the cellular phone, including to (1) press or swipe the fingers (including thumbs) of HARIS MATCHALOVAS to the fingerprint scanner of the cellular phone belonging to MATCHALOVAS found at the **Subject Premises**; (2) hold the cellular phone found at the **Subject Premises** in front of the face of HARIS MATCHALOVAS to activate the facial recognition feature; and/or (3) hold the cellular phone found at the **Subject Premises** in front of the face of HARIS MATCHALOVAS to activate the iris recognition feature, for the purpose of attempting to unlock the cellular phone in order to search the contents as authorized by this warrant.

66

145. The proposed warrant does not authorize law enforcement to require that HARIS MATCHALOVAS state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the cellular phone. Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel HARIS MATCHALOVAS to state or otherwise provide that information. However, the voluntary disclosure of such information by HARIS MATCHALOVAS would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask HARIS MATCHALOVAS for the password to the cellular phone, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks the cellular phone, the agents will not state or otherwise imply that the warrant requires HARIS MATCHALOVAS to state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the cellular phone, and will make clear that providing any such information is voluntary and that HARIS MATCHALOVAS is free to refuse the request.

## V.    CONCLUSION

146. Based on the above information, I respectfully submit that there is probable cause to believe that bank robbery offenses, in violation of Title 18, United States Code, Section 2113(a), have been committed, and that evidence, instrumentalities, and contraband relating to this criminal conduct, as further

67

described in Attachment B, will be found in the **Subject Premises**, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for the single-family home and attached garage located at 2410 Mark Avenue, Zion, Illinois, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

FURTHER AFFIANT SAYETH NOT.

*Herbert C Hogberg III*
_____
Herbert Hogberg III
Special Agent
Federal Bureau of Investigation

Sworn to and affirmed by telephone 17th day of October, 2022

_____
Honorable JEFFREY I. CUMMINGS
United States Magistrate Judge

## ATTACHMENT A

## DESCRIPTION OF PREMISES TO BE SEARCHED

The property to be searched is the single-family home and attached garage located at 2410 Mark Avenue, Zion, Illinois, 60099 (the "**Subject Premises**"). The **Subject Premises** is located on the west side of Mark Avenue. The **Subject Premises** is a two-story, single-family home with taupe siding and a brown roof. The black numbers "2410" are affixed to the left of the brown front door of the **Subject Premises**. The **Subject Premises** has an attached garage. Included in the property to be searched are three vehicles used by MATCHALOVAS in the commission of the bank robberies and parked on the **Subject Premises**: (1) a silver 2001 model Oldsmobile Aurora, bearing Illinois Registration CJ82727 and VIN 1G3GR64H114127051; (2) a red 2016 Cadillac SRX, bearing Illinois Registration DM30810 and VIN 3GYFNCE30GS504075; and (3) a black 2015 Cadillac SRX, bearing Illinois Registration P128429 and VIN 3GYFNFE31FS518728. Also included in the property to be searched are cellular telephones belonging to MATCHALOVAS, including a phone currently associated with telephone number (224) 302-8785.



**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED**

Evidence, instrumentalities and contraband concerning violations of Title 18, United States Code, Section 2113(a), as follows:

1. United States Currency;

2. Clothing consistent with that worn by MATCHALOVAS during the November 24, 2021, February 18, 2022, March 3, 2022, April 22, 2022, May 10, 2022, June 11, 2022, and August 3, 2022 bank robberies, as described in the search warrant affidavit, including but not limited to the following:

 a. a black "puffy" jacket;

 b. grey gloves with dark, latex-coated palms and white writing on the back of the palms;

 c. gray sweatpants with a Nike logo on the left thigh;

 d. black, Adidas-brand shoes with white soles;

 e. a blue or light blue surgical mask;

 f. a black, Adidas-brand backpack with a white Adidas logo and a grey interior;

 g. a black sweatshirt;

 h. a black knit hat;

 i. dark blue sweatpants;

 j. black shoes;

 k. a black, Reebok-brand backpack;

l.      a dark blue sweatshirt;

m.      gray shoes;

n.      a black backpack;

o.      a black and grey jacket with red trim;

p.      grey sweatpants;

q.      a black baseball hat with a "Bulls" logo on the front;

r.      a white cloth face mask;

s.       a black backpack with white lettering on a strap;

t.      a gray hooded Champion-brand sweatshirt;

u.      black sweatpants with vertical white stripes along the leg;

v.      a black baseball hat with a "DC" shoe company logo on the front;

w.      black mirrored sunglasses;

x.      a black baseball hat with a multiple "C" (Chicago Cubs) logos on the hat and bill;

y.      a black zip-up sweatshirt with a Puma logo;

z.      a grey t-shirt under the sweatshirt with multiple "Champion" logos and the word Champion on it;

aa.      blue scrubs pants;

bb.      grey shoes with white accented soles; and

cc.      a black baseball hat with a red bill and a yellow and red logo on the front.

2

3.      Bank bands used to bind large sums of United States currency;

4.      Knives with sharp blades 4 inches or more in length;

5.      Identification cards for HARIS MATCHALOVAS;

6.      An uninflated pool in purple and blue colors with a "Winnie the Pooh" design;

7.      Three cases of Remy cognac and two cases of D'Usse cognac; and

8.      Cellular telephones belonging to MATCHALOVAS, including the cellular telephone currently associated with telephone number (224) 302-8785.

9.      During the execution of the search of the **Subject Premises** described in Attachment A, law enforcement personnel are also specifically authorized to obtain from MATCHALOVAS (but not any other individuals present at the **Subject Premises** at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock cellular phones belonging to MATCHALOVAS requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that MATCHALOVAS's physical biometric characteristics will unlock the cellular phones belonging to MATCHALOVAS, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of the cellular phones belonging to MATCHALOVAS found at the **Subject Premises**, for

3

the purpose of attempting to unlock the phone's security features in order to search the contents as authorized by this warrant.

10.     While attempting to unlock the cellular phones belonging to MATCHALOVAS by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that HARIS MATCHALOVAS state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the phones. Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel HARIS MATCHALOVAS to state or otherwise provide that information. However, the voluntary disclosure of such information by HARIS MATCHALOVAS is permitted. To avoid confusion on that point, if agents in executing the warrant ask HARIS MATCHALOVAS for the password to the phones, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any the phones, the agents will not state or otherwise imply that the warrant requires HARIS MATCHALOVAS to state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the phones, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

4

## ADDENDUM TO ATTACHMENT B

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information, including cell phones, that are described in Attachment B and found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant.

Subject to the exceptions to the warrant requirement as recognized by law, the government may search only those electronic storage media that fall within the criteria as described in Attachment B, which may either be all electronic storage media found in the premises or only a subset of the electronic storage media found in the premises.

The government's review of removed electronic storage media shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.

The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

2